This Honorable Appellate Court of the 2nd District is in session, pursuant to adjournment. The Honorable Susan Faye Hutchinson presiding. Please be seated. Your Honor, the first case of the morning is called People v. Kennebrew on behalf of the Appalachians. Excuse me, Ms. Jessica Wynn-Arizo and on behalf of the people, Mr. Scott Jacobs. Good morning, counsel and those present. Whenever you're ready, you may begin. May it please the Court, again, Jessica Arizo on behalf of Reginald Kennebrew. The alleged victim in this case, DC, gave no accusatory testimony at trial and denied a crime even occurred. There was no evidence presented beyond hearsay statements. There was even a crime. Yet, DC's prior statement, the videotape, was allowed to be admitted and relied on heavily by the jury to convict Reginald Kennebrew. When she testified, did she remember drawing pictures or viewing some pictures and responding to, I believe it was a mistichman or someone? Did she remember that and were those introduced? She remembered parts of, you know, she didn't remember all the details. Isn't that all that she needs to do? And then he had an opportunity to cross-examine her, didn't he? She didn't make any statements that were accusatory. And that's our main argument here under Learnez, that she needed to not just testify.  She did say, though, that he rubbed lotion all over her while she was naked, including her privates, right? She did testify to that, but this man was her father figure, and he testified to that as well. But isn't that an issue for the trier effect? I mean, isn't that enough? In any case, in any sexual assault case, it's always her word versus his word. He's saying what I did was innocent. I rubbed her. I mean, I rubbed, you know, Vicks VapoRub on her chest because she had a cold. I rubbed Vaseline because she was chapped. I rubbed cream on, in this case. Isn't that his word against her word? And that would go to what his intent was? But she never said that he did anything improper. She didn't testify to anything improper. She didn't say he acted inappropriately and Mr. Kennedy said, no, I didn't. She didn't make those accusations at all in court. Oftentimes, child victims of child sexual assault don't really realize that what the man is doing is improper. I mean, he was kind of teetering on the edge there. Again, isn't that an issue for the trier of fact? Isn't that enough to allow her to be cross-examined with respect to that testimony? It's not enough here where she didn't testify, as she did in this video that was presented, that he put his thumbs in her Lucy, as the word she used then. She didn't testify to that fact. She didn't testify to anything. How old is she? She was seven going on eight. I think just to turn eight at the time of the statement on video. And I think she had just turned nine at the time of trial. Is there an issue that she didn't remember or she just didn't want to testify? It's unclear. Some statements she denied making, some statements she said she didn't remember. I don't know that she was reluctant to testify because she was now in court under oath and she was hesitant to repeat statements she had made prior because they weren't true. We don't know. We don't know why she didn't, why she testified the way she did and why she did not accuse him. And what's your definition of accusatory? That she would need to interject into her testimony that a crime happened. How does she know the definition of a crime? Well, she doesn't need to. I'm sorry. I don't mean to interrupt. Well, I mean, I'm trying to figure out what accusatory is. And you said she would have to inject that a crime happened. How does she know what a crime is? Well, I'm not saying that she has to say that it was a crime. Her testimony needs to be something beyond saying that nothing happened. Here she said, you know, he didn't touch me in a place that he shouldn't touch me. I mean, we have to go by the language and the words that she's using because that's, you know, the nature of her age. How do we know that? I mean, here's the problem that I'm having. She's 8 going on 9. This happened when she was maybe 7. He is her father figure, as you've indicated. Mom works nights, I think. And so he gets her or mom works mornings. But he's either getting her ready for bed or getting her up in the morning, one of the two. He's getting her dressed. He's doing all of these things. And he may do it over a period of time. How does she know it's wrong? And how does she know that she needs to repeat that in a courtroom to be accusatory? Well, she would know what she had testified. Not testified. I'm sorry. She would know the statement she had made before, and she would know why. Why would she know what she said? Right. I'm sorry. Do you know what you had for lunch yesterday? What I'm saying is how does this child know what she said to someone else, even if it is true? If you're asking her, she might have talked to that person about a lot of things. And without leading her, although I think ultimately they did, but without leading her, how do you get there? And then when you treat her as a hostile witness, how do you keep her communicative? She's eight. Right. I mean, as you said, they did have the opportunity to treat her as a hostile witness, and they were leading her, and she still didn't give testimony that would suggest that even a crime happened here. I mean, this isn't a case where, you know, we know that someone was shot, and the witness comes and says, I didn't say that statement. We don't have anything besides what she had said to know that this was a crime. This also isn't a case, though, where she resolutely, I think is the term, resolutely refused to testify, though, right? Well, prior to being treated as a hostile witness, she was putting her head down, she was hesitating, she wasn't responding, and it wasn't until the state was allowed to lead her that she then answered, no, no, yes, no, to the questions. Despite that, the point remains, she didn't accuse. She never made any accusatory statements. And as Lauren says, if the only person who can accuse a defendant is this child witness, she must testify and accuse. And here there's just nobody else besides the hearsay reporters who can say anything accusatory against Mr. Kettenbrough. How about the nurse? Right, the nurse. You're talking about the physical testimony. Right. The nurse testified that there was redness and I can't remember the terminology, but I can't remember the exact wording. There was redness and a cleft in the hymenal tissue that had begun to heal. Her testimony that it was consistent with sexual abuse but could have been caused by other things, such as masturbation. The redness on her skin could have been caused by poor hygiene or urination. So it wasn't affirmative, it wasn't definite that this was a sexual assault or sexual conduct, and certainly not by Mr. Kettenbrough. When she testified, though, she also remembered telling Ciara that the defendant had rubbed his thing across her butt, right? Isn't that what she said? She said that she remembered telling her that, but she did not say that that happened. She did not testify that that happened. Right. Only that the statement to her happened. Again, isn't that an issue to the trier of fact? I mean, it's a sex case. If you had a camera or an eyeball witness, every sex case in the country would be much easier for any prosecutor. Isn't that the reason that they implemented 11510? I mean, you're not going to have an eyeball witness. You're not going to have any medical examiners say it's 100% as a result of sexual assault. They're all going to say, yeah, it could have been caused from riding a horse. It could have been caused from her cheerleading. But, you know, it is consistent with sexual assault. So I guess you're looking for an ironclad case. Isn't this case a little different than the Lund case? It is somewhat different than Lund, but it's also very different from cases on the other side. Where here, like in Lund, there's no other evidence. There's not, you know, in Sundling, I believe there was an eyewitness to the actual incident. You know, there was a testimony that the defendant himself had made in admission and, you know, other cases like that. Here, there's nothing else. And that's what we're not saying that every single case you need a camera. You know, you need somebody to have been there to see it. But you need to have something else besides the witness who's saying nothing happened in order for this statement to come in. Well, she said no, but she did remember other things. Why can't the trier of fact, why can't the trial judge, and why can't we consider those other things as corroborative of some of the other information that we know throughout the proceedings? Such as the Tishman conversation, such as the conversation with Ciara, such as the question to, I think it's Aaliyah, you know, does your daddy touch you this way? I mean, to me, that indicates that she's just confused at that point. Does your daddy ever touch you that way? To which she responded no. So, I mean, she's trying to figure this out, it appears. Right, and again, I would just say these statements, you know, she's denying she made that specific statement to Aaliyah at trial. She's denying that she asked her about that. And so the problem is that at trial, there's nothing to cross-examine her about because she hasn't said that a crime happened. In fact, she said a crime didn't happen. All right, in Learn, I mean, I am unfortunately rather familiar with Learn, and not unfortunate because I still think it's the right decision. In that case, that child testified about a house, about where her grandmother slept, that she had an aunt, that the aunt was married to Jimmy. She didn't particularly like Jimmy, but she couldn't tell anybody why. And every time somebody asked her a question, according to the record, that might relate to the incident, she put her head down and she cried. And according to the judge, he said, although I found her to be confident and she didn't testify at the proceedings, he doesn't say anything about what she testified to, he says, but she was, every time somebody asked her a limited question, she began to cry again and it was not a light crying by a child. She didn't testify to anything that related to this except the people who might, you know, who are her family members. Here we have significantly more information from her on the stand than we got from our victim in Learn. Well, I would agree that this isn't exactly like Learn, certainly. There's more, she answered more questions than the victim in Learn did. But that doesn't mean that Learn doesn't apply entirely here. We still have the issue of her not giving accusatory testimony and her being the only person besides hearsay reporters that could give accusatory testimony. And that's our main point here, that although she may not have, she may have answered more questions than the Learn witness, and she didn't shut down entirely, especially given when she was, you know, allowed to be cross-examined by the state. She did answer more questions at that point, but that doesn't mean that Learn shouldn't apply here. Are you familiar with the Martin case, domestic violence case from Kane County, I believe, where the victim actually didn't remember any events, she testified she didn't remember any events of that date. She was drinking, she didn't remember any altercation or argument even that she had. She didn't remember talking to the police, yet that is affirmed, that conviction. Yes. Right? Yes. I would distinguish that case from this case in that based purely on the facts presented, the officer, I don't recall the name of the officer, but the officer testified to seeing her, I believe, pull up in the car, you know, sped up in the car, jumped out of the car, was physically injured. I think it was a black eye, bleeding lip, something like that. And, I mean, then the officer came and testified that he, she came and then, you know, had his excited utterance statement. I don't know if that's how it was brought in, but, you know, he just, my boyfriend hit me or something to that effect. I mean, that's different here. Here we have a conversation supposedly taking place between D.C. and her cousin, maybe a few months after this happened. It's not quite clear. She, you know, she's taken in by her mother to have this interview. This is just, it's very different from the Martin case, and I would suggest that there was someone else to at least provide some accusatory testimony in terms of the officer's testimony. Some corroboration. I don't know that it was necessarily accusatory. She did sign a, the victim in that case, a written statement, and I thought it might have been a little bit of... I believe she acknowledged... She had a cut lip and an injury around her eye. I believe she acknowledged at trial that she had written the statement, or that it was her handwriting. It was her handwriting, right, right. Are you, are you, you're alleging in your brief that the declarant was not, was unavailable. And did the defense attorney attempt to cross-examine the child? No, and this is a situation like this. I believe, I think it was the learned court discussed this, and maybe it was another case as well, that at this point, what can a defense attorney do? You know, get up and cross-examine the witness and interject evidence against his own client? I mean, what is a defense counsel to do in a situation like that? Well, how do you claim the child is unavailable for cross-examination under Crawford when he doesn't even attempt to cross-examine? Right, well, I believe, I want to say the Rolandes G case, that attorney also did not cross-examine, given the chance to cross-examine, did not. I know that's very different factually, but that witness is still found to be unavailable, even though defense counsel didn't try to make any questions towards him. I mean, I would just say that, I mean, what is defense counsel going to, I mean, you can't really even say it's a strategy, because what is defense counsel, how can you decide, okay, yeah, maybe, yes, maybe I can ask them questions, and then bring in the accusatory statement yourself? I mean, no defense attorney is going to do that. Isn't that kind of the definition of a strategic decision as to whether or not to cross-examine? But it's almost as though there's no decision to make. I mean, what defense attorney would say, yes, I'm going to, I mean, I just don't see that that's a choice, that a defense attorney could ever make the choice to, yes, I'm going to bring in this evidence against my client and not be ineffective in that way. And how about, nothing ever happened, did it, D.C.? She probably would have said no. But, yeah, we don't know what her response would be, and I guess that would be why counsel wouldn't ask a question. I do have one other question, although I know the buzzer has gone off. You said that D.C. indicated she didn't tell her cousin anything. Didn't she, in fact, ask her cousin about things of this nature? Specifically, didn't she say something about, or did she tell that someone might have touched her in a place they shouldn't have, although she didn't remember any of the particulars? Didn't she have a conversation with Aaliyah that she admitted? I believe you, yes, you are correct. All right. Are there other questions? I would just ask that this court find that the defendant's post-conviction petition has made a showing of a gist and remand for additional proceedings. Thank you. You'll have an opportunity for rebuttal. Mr. Jacobson. Good morning, Madam Presiding Justice, and may it please the court. I believe that both the defendant in this case and, respectfully, the majority in Warren are starting from the wrong premise about accusatory testimony. I think, Justice Hutchinson, you had asked a question earlier that helped suss out a significant problem here, which is at what point does testimony become sufficiently accusatory? And the answer is when a witness appears at trial, and there are many dimensions to this. The chief complaint from the defendant is that because of her testimony in this case, D.C. was, according to the defendant, unavailable for trial, that counsel didn't have an opportunity to exercise any form of discretion as to whether or not counsel would cross-examine D.C. strategically. I would submit to you that that's just not the case. I don't think that there is any better testimony that you can have from a witness in a case from a defendant's point of view. I don't think there's any better testimony you can have other than the state's key witness saying, I don't remember what happened, I don't want to talk about it, I don't remember what I said. I mean, this is pivotal testimony for a defendant. So to say that the defendant was denied an opportunity to cross-examine the witness in this case is just not the case. The defendant chose not to, and I think that was a sound choice because what cross-examination could have been better than what had already been elicited on direct that caused the state to treat D.C. as a hostile witness. So, respectfully, I think the defendant has had every opportunity to avail himself of cross-examination in this case, and I don't think he could have reasonably hoped for any better testimony than what he got on direct. I know you don't like to learn. It's not obvious. But how do you – it's the law, I guess. It's still out there. I know that not too many courts have cited it and agreed with it, but how do you distinguish that from this case? Well, first, just to be clear, no court – Carefully. Carefully. No court has cited learn positively. Other than Kitch. Kitch cited it with approval, and I think the Supreme Court is kind of a court. No, I agree. I don't agree with you about citing it with approval, though. I think as an aside, what they say is that what they're holding is with respect to the witnesses in Kitch doesn't contravene the rule in learn because the witnesses in Kitch appeared – they testified in a manner that the Supreme Court considered to be sufficiently accusatory. My problem is we don't know what accusatory means. Learn doesn't tell us. Certainly, Kitch doesn't either. And as you were pointing out before, how much testimony does this witness have to provide in order to satisfy that burden? I don't know the answer to it. Well, in learn, it was identifying the family members. That's all she was able to do other than say, I don't like Uncle Jimmy. I don't think she even called him uncle. She knew that he was Aunt Albertina's husband. Here, there are other things that this child has said. I think – I would submit that the problem in learn is a witness competency problem rather than a confrontation clause problem. Well, and in fact, we – Justice McClaren and I decided that case with a dissent, and I can't remember the dissent. It's amazing how things just disappear. It was Justice Hudson. Of course it was. Yes. You know – It's amazing how you want to forget. You don't want to – you know, it's – this is very different. And we found that that was a competency case and that she really wasn't competent to testify. I understand that. But if it's a competency problem, I don't think we should be calling it a confrontation problem. Well, I didn't. Somebody – actually, I think it was Justice Steigman who did. Who called it a competency problem. No, a confrontation problem. Rather – rather – Well, I mean, the decision was written in terms of Crawford. I know. Yes, but – because that was what was raised. Okay. I understand that Justice Steigman and Justice McClaren might not play well together. No. But, you know, that aside, I do think – I think you yourself have brought out some of the difficulties in applying the Learn decision to the facts of, let's say, this case. I believe other Illinois courts have pointed out the difficulty in applying Learn at all. So – I understand. Okay. And they're the Fourth District. Where does Justice Steigman sit? I believe – yes. But you could already answer that question. Okay. So let me just get back to Justice Shostak's question then, which now I am forgetting. So if you could ask it. Which was how do you distinguish Learn, even if you don't like it? How do you distinguish it from the case here? I would say that whatever accusatory means, the witness in this case met that definition. Again, to me, it's the difficulty of applying an unknown definition to the facts of this case. So I think the only thing we can do is compare D.C.'s testimony to K.O.'s testimony in Learn. Well, we know that there's a string of cases that say gaps in memory don't necessarily disqualify a witness for the confrontation clause, right? Yes. At what point, though, do these gaps in memory become so severe that you have to say, well, even if he did ask a few questions, or whether he did or not, there really wasn't a sufficient opportunity to cross-examine? Is there a point? Is there a point? No, I don't believe that there is. I think maybe the point is on competency and disqualification. At the point where the witness is so unable to testify that he or she should not be on the witness stand. But otherwise, as I said before, what better testimony could you have than a witness saying, I don't know, I don't remember this very significant thing that happened in my life? You know, I don't remember making a statement to Mary Saltish. I don't remember telling Aaliyah what happened, or asking Aaliyah questions. I don't remember telling Ciara what happened when we were at Pizza Hut. Those are all great statements from the defendant's point of view. So I think this is probably the most fortuitous testimony he could have hoped for in this case. I would submit, though, that the issue of competency and availability can intersect, but availability for the purposes of the Confrontation Clause means the ability to cross-examine the witness. It doesn't mean that the witness's testimony has to live up to the defendant's expectations. It doesn't have to be effective from the defendant's point of view. I mean, I would submit here that it was, but it doesn't have to be. You know, I think the court in Garcia-Cardova put it best. I don't think that in Crawford, the United States Supreme Court meant to upend Delaware v. Fenster and Owens v. United States without ever saying so. So I think whatever the definition of accusatory is, the witness in this case met it. So if you want to say that Lerner is distinguishable, you have that option. I would submit to the court, though, that because Lerner does not define what it means to have accusatory testimony,  so respectfully, I know this court is of limited power to, this court can say what the law is, but not necessarily what the law isn't. I understand that anomaly in Illinois law. I would submit to you, though, that the best course of action is to continue to distance yourselves from Lerner, to say that, you know, Lerner is limited to its facts. Whatever the benchmark is, the witness in this case met it. The defendant wasn't denied anything constitutionally. In Lerner, although it hasn't been argued here, the mere presence of the child was availability, whether she testified to anything other than her name. I mean, that was one of the actual, I think, arguments that they tried to develop. You're not saying that's a valid argument, are you? That just appearing in the courtroom, stepping in the courtroom, testifying under oath that my name is D.C. In the brief, I put it in terms of the witness's willingness and ability to answer questions, period. Any questions? Any questions. Is it raining today? Is it sunny out? Does it have to somehow relate to the case? My, no. What's the competency then? I would put that under competency as opposed to availability for confrontation purposes. I mean, whatever our concerns are for the confrontation clause, being able to confront this witness on cross-examination to make sure that they're bearing truthful testimony. I mean, if a witness goes up there and answers questions about the weather and nothing else, that's going to be bad for the prosecution no matter what. That's going to be great for the defendant. I think it is a sliding scale in terms of our ability to suss out the reliability of the witness's testimony, which is uniquely a 11510 issue, as Kitch teaches, and the ability to say that the defendant had an opportunity to cross-examine this witness. Is it any different than a, as Justice Spence pointed out, a domestic battery where the victim takes a stand, and as a prosecutor, I think every prosecutor has been there, and the witness takes a stand and said that never happened. I don't think there's a distinction. The defendant put out two distinctions, though, in his reply brief. The first is between the cloistered-off area of child sex cases under 11510 in Illinois and all non-sex cases, so that any case the state cited under the proposition of memory loss was somehow out of the box because it didn't deal directly with the child sex case. And then a distinction between victims and witnesses, which I think is inconsistent with the United States Supreme Court's decision in both Cumming and Melendez-Diaz. I don't think it matters if the witness in question is a victim or an expert witness or any other witness, and I don't think it matters if we're talking about a child sex case under 11510 or a generic memory loss issue under Section 11510.1. The issue of confrontation and availability is something that has a lot of different dimensions to it, and I think all those dimensions are—I think availability is best answered. The question of availability is best answered when you have a witness on the stand who is answering questions. You know, that gives the defendant the opportunity to cross-examine the witness, obviously with some latitude, but that's all that's required constitutionally. So in the case of a potential flipper where there may be a refusal to answer any questions, obviously the court has contempt powers and so forth, but let's say—and this is a little hypothetical and off the path here, but if that witness refuses to answer any questions, is that witness available? Respectfully, I don't think it's off the path at all. I think this occurs quite often, and the answer is no, the witness was available. I mean, we put the witness on the stand. The witness's testimony didn't live up to the state's expectations. What if there was no testimony? If the witness states their name and then refuses to answer any questions? I think the defendant has an opportunity for effective cross-examination there. I think the witness is available. The witness is on the stand. You know, we have to put the witness on the stand in order—I'm not putting this out there as like, oh, poor state, the hurdles you have to jump through to get witness testimony in. I'm saying the reason that we have 11510.1 is to guard against turncoat witnesses. I'll put it another way. I don't think it would have made a difference if we had confronted—when D.C. was on the stand, if we had confronted her with the victim-sensitive interview as opposed to having it admitted through Tishman. The only difference is it would have been admissible under 11510.1 as opposed to 11510. Nevertheless, it was still going to be admitted. D.C. was still on the stand, and defendants still had an opportunity to cross-examine her. I don't think the Confrontation Clause requires anything more. Is there no further questions? Thank you. Mr. Rizzo? Yes. Just briefly, I would have to disagree that the testimony in this case was good for the defense because she did not accuse Mr. Kennebrew of anything, and yet then the statement got to come in in its entirety without the ability to cross-examine. How that was good for—that was not good for Mr. Kennebrew. How did he not have the ability to cross-examine? Because he did not have the ability to cross-examine because she hadn't made any accusatory statements. As I said earlier, how is the defense counsel going to cross-examine her when she hasn't put any facts against the defendant into the trial? That was his choice. That was his choice to stay seated and say no questions. But he didn't have to make that choice. The witness was on the stand. The witness was available for him to cross-examine. He made that determination strategically not to ask any questions, didn't he? As I said earlier, the point made by this court in Learn was that what defense counsel would make that choice? How is that availability— What is the definition of availability under Crawford? The ability to be able to cross-examine, to have that choice, I suppose, right? But I would argue that here there was no choice. The witness had not made any accusations here that would lead— no facts had been presented that would lead to an accusation. I mean, I know counsel was saying they should have— There were a lot of facts that were— There were a lot of statements made that would lead to an inference, weren't there? An inference, perhaps, information surrounding kind of around what happened, but nothing accusatory. In fact, she said nothing happened. When he would rub cream on her after she got out of the shower. Right. He would lay on her stomach and he would rub cream on her. Couldn't that, when you're charged with a sexual abuse or sexual assault, as he was initially, wouldn't that rise to an inference, a reasonable inference for the jurors to make a determination that perhaps he had some other intentions or other motive? I would— Isn't that something you might want to defend? I'm sorry, defend— You might want to cross-examine on that? Isn't that something you can cross-examine on? That he put lotion on her? Well, I mean, he testified later that he did put lotion on her. That wasn't a fact that was in contention. He admitted that this was a practice that he did as her father figure, you know, stepfather figure, and it wasn't a contested fact at all. It was— Well, no, but it was certainly something he felt he had to explain when he got on the witness stand, correct? Right. So isn't that something that his attorney could have cross-examined the child about? Like, hey, D.C., didn't, you know, your daddy, your stepdaddy, always rub cream when you got out of the shower? Did you think that was weird? You know, that wasn't weird, was it? I mean, didn't it give him something to cross-examine? I mean, let's look at availability. Child was available. The child was sitting there. She was ready to be cross-examined. He made the choice not to cross-examine, and you're saying he couldn't cross-examine because there was nothing to cross-examine on. That's not what Learn said. There was nothing to—let me find exactly what I was quoting about Learn. I'm not sure if this is a direct quote. I have it in my notes. The Lord Court says, And I guess that's what our—that's the point I'm trying to make is that defense counsel is not going to want to, you know, bring out facts from this witness that's going to turn her into an accusatory witness. That was his choice. That's his strategy. And you know what? I don't blame him, but that doesn't mean the child is not unavailable because he made that choice to proceed in that manner. And all I can say is that, you know, under Learn, it says that he needs to make accusatory testimony in order to be available, and that's—I mean, I believe that Learn still is good law, and I believe that this Court should follow that. Thank you. Thank you. Thank you, counsel, for your argument this morning. We will take the matter under advisement, make a decision in due course, and we're going to recess for our next hearing to get in place.